IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **INLAND MORTGAGE CAPITAL CORPORATION**, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 11 C 6482 |
| **CHIVAS RETAIL PARTNERS, LLC**, et al., | )<br>)<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

In September 2011 Inland Mortgage Capital Corp. ("Inland") filed this action against Chivas Retail Partners, LLC, the TJD Separate Property Trust and its Trustee Tim Dollander and the Walter L. Brown Jr. Revocable Trust and its trustee Walter Brown Jr. (collectively "Guarantors"), alleging their nonpayment under a loan guaranty agreement ("Guaranty Agreement"). After this Court denied a motion to dismiss filed by Guarantors (841 F. Supp. 2d 1029 (N.D. Ill. 2012)), Inland moved for summary judgment under Fed. R. Civ. P. ("Rule") 56. This Court's August 3, 2012 memorandum opinion and order ("Liability Opinion," 2012 WL 3205041) granted summary judgment in favor of Inland as to liability but reserved the question of damages pending the submission of Guarantors' surreply on that issue.

That submission has now been made, and upon this Court's review of the parties' memoranda it is clear that Inland has carried its burden of showing the absence of any genuine issues of material fact as to the damages owed by Guarantors. Accordingly Inland's Rule 56 motion will also be granted in full as to damages.

**Summary Judgment Standard**

Because the Liability Opinion has already spelled out the operative Rule 56 standards, they will not be repeated here. And for the same reason, this opinion will not echo the detailed version of the underlying facts as laid out in the Liability Opinion -- instead it will simply summarize facts that are relevant to the issue of damages. Those facts will be viewed, of course, in the light most favorable to nonmovant Guarantors -- a requirement applied within any limitations created by the extent of their compliance (or noncompliance) with the strictures of this District Court's LR 56.1, adopted to implement Rule 56.

**Background**

In June 2007 Harbins Crossing TC, LLC ("Borrower") took out a loan of $15,590,199.57 (the "Loan") from Inland to build a retail shopping center (the "Property") in Georgia -- a loan secured by the Property itself (G. R. St. ¶¶8-11).[1] Guarantors guaranteed payment of the Loan under the terms of the Guaranty Agreement (id. ¶¶11-12). Borrower eventually defaulted, causing the Loan to be accelerated and the Property to be foreclosed upon (id. ¶¶13-15).

In Georgia foreclosure sales are non-judicial, so a sheriff's sale of the Property was held without judicial oversight, and Inland purchased the property with a credit bid of $7 million (id. ¶¶15-16). Inland has shown that far more than $7 million was due on the Loan at the time of the foreclosure sale, so that a deficiency existed after the sale (I. Mem. 4). In Georgia such a

---

[1] Inland's LR 56.1 statement will be cited "I. St. ¶--," with Guarantors' response to that statement cited "G. R. St. ¶--." Inland's memorandum in support of its motion will be cited "I. Mem. --," with Guarantors' responsive memorandum being cited "G. Mem. --," Inland's reply memorandum being cited "I. R. Mem. --" and Guarantors' surreply memorandum being cited "G. S. Mem. --." Exhibits attached to the parties' various submissions will be cited in the same manner, with the added citation "Ex. --."

deficiency cannot be collected upon against a borrower unless and until a court rules that the sale price of a loan's collateral at a foreclosure sale represents the "fair market value" of that collateral, a ruling that must be made at a confirmation hearing (Liability Opinion, 2012 WL 3205041, at *1). Inland brought an action for such confirmation in Georgia and lost, thus failing to get confirmation that its $7 million credit bid on the Property represented its fair market value for purposes of any deficiency against the Borrower (id.).

With a multimillion dollar portion of the Loan remaining unpaid after its credit bid on the Property, Inland brought this action against Guarantors to recover the amount owed on the Loan at the time of foreclosure, plus interest and less the $7 million credit bid (I. Mem. 4). Guarantors have repeatedly argued that this action is nothing more than a suit to obtain the deficiency that, according to Guarantors, is not recoverable because of Inland's lack of success in the confirmation action. But this Court has rejected that argument in the Liability Opinion at *5, reasoning that the Guaranty Agreement includes a waiver of Guarantors' right to make that deficiency argument (id. at *3), as well as including an explicit anticipation of the possibility that the present situation might arise, as stated id. at *4, quoting I. Mem. Ex. B ¶9(c)):

> The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

All that remains, then, is to determine the amount owed to Inland under the Guaranty Agreement. More immediately, this Court must determine whether the issue of damages can be resolved on this current motion Rule 56 or requires a trial.

## Damages Calculation

In its LR 56.1 statement Inland provided the following calculations, said to represent the

amount still owed by Guarantors as of March 1, 2012 under (1) the Installment Note (that memorialized the Loan) and (2) the Guaranty Agreement (I. St. ¶24):

| | |
|---|---:|
| Principal Balance at Maturity Date of 8/11/2008 | $15,000,000.00 |
| Default Interest – 9/1/2008 through 8/31/2009 | $2,737,500.00 |
|     Default Rate = 18%[2] | |
|     Per Diem Interest on 360-day basis = 7,500.00 | |
| Total Amount Due as of 8/31/2009 | $17,737,500.00 |
| Less: Credit Bid at Sale on 9/1/2009 | $7,000,000.00) |
| **Total Due After Sale** | **$10,737,500.00** |
| | |
| Default Interest from 9/1/2009 through 3/1/2012 | $5,528,653.24 |
|     Default Rate = 18% | |
|     Per Diem Interest on 360-day basis = $6,055.48 | |
| Balance Due for 2008 Real Estate Taxes plus penalties | $250,890.54 |
| **Total Amount Due** | **$16,517,043.78** |

Inland's Rule 56 motion sought that total amount plus any pre-judgment and post-judgment interest that would accrue before Guarantors' payment was made (I. Mem. 7). Inland's President Art Rendak ("Rendak") swore to an affidavit that served as the source for those calculations (I. St. ¶24).

In their responsive memorandum and LR 56.1 statement Guarantors have taken issue with Rendak's damages calculations for two reasons (G. Mem. 17; G. St. ¶24). First, they maintain that Rendak did not calculate the amount due under the Guaranty Agreement himself and lacks the underlying knowledge necessary to state the amount of damages accurately in this action (G. Mem. 17). Guarantors also contend that, contrary to Inland's assertions, they had made payments on the Loan and those payments were not reflected in the damages calculation provided by Inland (id.). In support of the latter contention Guarantors have submitted the affidavit of Tim

---

[2] [Footnote by this Court] Inland and the Borrower agreed on that "default rate" in the Installment Note (I. Mem. Ex. A at 5).

Dollander, in which he swore that Guarantors had in fact made payments on the Loan, as well as tendering a document that is purportedly a record of Guarantors' payments on the Loan from its inception (G. Mem. Ex. 1). Although Guarantors did not point to any particular part of Rendak's calculations that they believe to be false or that failed to take prior payments into account, they urged that summary judgment on the issue of damages is inappropriate.

In its reply Inland acknowledged that some of Guarantors' assertions were valid. Accordingly Inland submitted another affidavit -- that of Marie Svehla ("Svehla"), Inland's Vice President and the person who was responsible for computing the calculations embodied in Rendak's affidavit (I. R. Mem. Ex. 1). Svehla affirmed that there were two payments totaling $180,875 that had been received after October 8, 2008 and that had not been accounted for in Rendak's original affidavit (I. R. Mem. Ex. 1 ¶11). Those payments were now credited in the "Default Interest -- 9/1/2008 through 8/31/2009" section of a new set of calculations performed by Svehla (id. at ¶10):

| | |
|---|---:|
| Principal Balance at Maturity Date of 8/11/2008 | $15,000,000.00 |
| Default Interest – 9/1/2008 through 8/31/2009 | $2,556,625.00 |
|     Default Rate = 18% | |
|     Per Diem Interest on 360-day basis = 7,500.00 | |
| Total Amount Due as of 8/31/2009 | $17,556,625.00 |
| Less: Credit Bid at Sale on 9/1/2009 | ($7,000,000.00) |
| **Total Due After Sale** | **$10,556,625.00** |
| | |
| Default Interest from 9/1/2009 through 3/1/2012 | $4,819,097.03 |
|     Default Rate = 18% | |
|     Per Diem Interest on 360-day basis = $5,278.31 | |
| Balance Due for 2008 Real Estate Taxes plus penalties | $250,890.54 |
| Total Amount Due as of March 1, 2012 | **$15,626,612.57**. |

According to Svehla, those new calculations were compiled using information found in a document summarizing all activity on the Loan, which was kept in Inland's ordinary course of business (id. at ¶¶2-4; I. R. Mem. Ex. A). Svehla also points out that Rendak's post-sale per diem interest figure was calculated using a principal amount that included certain fees that Inland is not seeking to recover (I. R. Mem. Ex. 1 at ¶11). Svehla's lower per diem interest figure is based on her updated principal amount, which both (1) does not include those additional fees not sought by Inland in this action and (2) does credit the two payments made on the Loan that Rendak's figure had failed to take into account (id.). In light of the revisions to its damages calculation as well as the newly-added interest amount of $554,222.55 (which had accrued between the filing of Inland's original motion and the filing of its Reply Memorandum), Inland asked for an award of $16,180,835.12 (the amount as of June 14, 2012) plus any additional interest that will have accrued post June 14 and up to the date of judgment (I. R. Mem. 10).

As is evident, the concerns raised by Guarantors' objections to Rendak's affidavit -- to whatever extent they had merit -- have been fully alleviated by Svehla's affidavit and the accompanying business records. First, whether or not Rendak had the foundational knowledge necessary to support the calculations set out in his affidavit, Svehla explicitly states that she does have such knowledge (I. R. Mem. Ex 1 at ¶12), and Guarantors do not argue otherwise. Svehla was responsible for computing the calculations in the first instance, and her figures were based on records that would have been admissible at trial under the business records exception to the hearsay rule (see Fed. R. Evid. 803(6); I. R. Mem. Ex. 1 at ¶¶2-8), so that the calculations are supported by an impeccable foundation. Second, Svehla's calculations and accompanying records have taken account of all payments made on the Loan by either Guarantors or the

- 6 -

Borrowers. Inland's Exhibit A attached to its Reply Memorandum provides a full history of all transactions involving the Loan, beginning with the initial disbursement of $15,590,199.57 on June 6, 2007, and the math adds up (I. R. Mem. Ex. A). Each payment that Guarantors claim to have made by way of their own records (see G. Mem. Ex. 1) is accounted for in Inland's Loan transaction history (I. R. Mem. Ex. A) and is therefore included in Svehla's damages calculation (I. R. Mem. Ex. 1).

Although Inland contests whether it was Guarantors or the Borrower that made the payments in question and whether Guarantors' proof of those payments would be admissible at trial, these matters are wholly irrelevant to the issue of how much money is actually due under the Installment Note and Guaranty Agreement. Because it is clear from the parties' submissions that all payments made to Inland, by whomever made, were in fact taken into account in the most recent calculation of damages, there are no questions of material fact that exist as a result of the issues raised in Guarantors' Responsive Memorandum.

Nor does Guarantors' Surreply Memorandum raise any facts or arguments in conflict with what has been said to this point -- but it does advance two additional arguments as to damages.[3] Those contentions are considered here seriatim.

Guarantors first call Inland's new damages calculation into question generally. To that end they cite only the fact that the second figure differed from the original calculation -- a fact

---

[3] Guarantors' Surreply Memorandum is primarily aimed at the issue of liability, employing the same claim preclusion, issue preclusion and Georgia state law arguments that were advanced in Guarantors' earlier Responsive Memorandum (see G. S. Mem. 5-14). But as said earlier, the issue of liability was resolved in this Court's Liability Opinion, and Guarantors' Surreply Memorandum was needed only to provide adequate briefing on the issue of damages. As such, Guarantors' non-damages arguments will be disregarded in this opinion.

that purportedly, as Guarantors would have it, renders the calculation untrustworthy (G. S. Mem. 4). But any such "bare assertion that the amounts may be inaccurate in some way" is not enough to raise a genuine issue of material fact (LINC Fin. Corp. v. Onwuteaka, 129 F.3d 917, 922 (7th Cir. 1997)). Moreover, Svehla's calculations are in lockstep with the materials submitted by both parties, so that Guarantors have not put forth even a scintilla of evidence that Inland's updated calculations are mistaken.

Next Guarantors argue that the new calculations are "built upon a flawed foundation," given the Georgia state courts' rulings that Inland's $7 million credit bid did not represent the fair market value of the Property (G. S. Mem. 4). According to Guarantors, the amount owed on the Loan should be discounted by the fair market value of the Property acquired by Inland, rather than by the amount paid for the Property at auction, so that the calculations are unreliable -- that is, are wrong (G. S. Mem. 4). That argument, however, has already been rejected by the Liability Opinion, which pointed to the already-quoted language in the Guaranty Agreement (I. Mem. Ex. B. ¶9(c)(1)) that controls as to the debt amount:

> The amount of the debt may be reduced only by the price for which that collateral [the Property] is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

What Guarantors' counsel gloss over entirely -- or to be less charitable and euphemistic and more accurate, would like us to forget -- is just how and why the Guaranty Agreement came to be in the first place. It was an integral part of a freely negotiated arms-length transaction initiated by Guarantors to finance a proposed real estate development not yet in being. Inland was not seeking to acquire a real estate investment, but rather to put its money to work to obtain its repayment with interest. And like any financial institution lending out its assets -- money -- it

sought terms best calculated to assure that result, including the personal undertakings of the Guarantors.[4]

"Fair market value," the term that is used in the Georgia statute as relevant between borrowers and lenders in the foreclosure context and that Guarantors impermissibly seek to import into their contractual relationship with Inland, is of course synonymous with "worth," the term that Guaranty Agreement ¶9(c)(1) has expressly made <u>irrelevant</u> as between Guarantors and Inland. That express provision served the obvious purpose -- perhaps more importantly, it has the obvious effect -- of forestalling the kind of second guessing and revisionism through which Guarantors now attempt to excise from the Guaranty Agreement an unambiguous provision that was and is just as integral to its terms as any other of its provisions.

In sum, what Guarantors essay here is an impermissible effort to inject uncertainty into the certain terms of the transaction that they entered into freely when the future looked rosier than it ultimately turned out to be. They made their deal, and they must live with it. Inland is entitled to the benefit of its bargain, and Guarantors must bear what turned out to be the detriment of one of the terms of <u>their</u> bargain. It is therefore entirely proper for Inland to deduct from its undisputed entitlement the $7 million price at which the Property was sold in foreclosure, rather than whatever number might have been arrived at as the Property's "fair

---

[4] What Guarantors would relately prefer that we forget is that if their real estate deal had turned out as they obviously hoped when they sought and obtained the Loan, all of the consequent profits and equity would have inured to them, with Inland recouping only the Loan principal together with interest at the rate that the parties had bargained for. Now, with things having turned out differently, Guarantors are essentially seeking to renegotiate the deal that they made. Such hindsight may be useful toward the negotiation of future deals, but in the commercial world it is unavailable to recast transactions that have been formally confirmed and consummated.

market value" or "worth" by some other means or procedure.

## Conclusion

There is no genuine issue of material fact as to the amount of damages to be paid to Inland by Guarantors, and Inland is entitled to a judgment as a matter of law. Its Rule 56 motion is granted.

As stated earlier, Guarantors owed $16,180,835.12 on the Loan as of June 14, 2012 (I. R. Mem. 9-10). Between that date and today's judgment order date (a total of 140 days) interest has been accruing at a rate of $5,278.31 per diem, putting that added interest figure at $738,963.40 and the consequent total indebtedness at $16,919,798.52. Judgment is ordered to be entered in that amount in favor of Inland and against Guarantors jointly and severally.

_____
Milton I. Shadur
Senior United States District Judge

Date: November 1, 2012